# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HAMILTON EQUIPMENT, INC.** | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 19-300 |
| | : | |
| **DANUSER MACHINE COMPANY, INC.** | : | |

## MEMORANDUM

**SCHMEHL, J.**   /s/ JLS                                                                                  OCTOBER 7, 2019

Plaintiff, a Pennsylvania corporation, brought this action, claiming the Defendant, a Missouri corporation, breached a distributor agreement it had entered into with Plaintiff when Defendant terminated the agreement without providing good cause and proper notice as required by Missouri law. In its Amended Complaint, Plaintiff asserts a claim against the Defendant for violations of the Missouri Farm Implement Dealership Agreements Act (Count One), and three breach of contract claims (Counts Two, Three and Four). Presently before the Court is the Defendant's motion to dismiss the Amended Complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is granted.

## STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), the district court should "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks and citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

1

678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plaintiff need not satisfy any "probability" requirement, but must set forth "more than a sheer possibility" that the defendant's actions give rise to the claim. *Id.*

**FACTUAL ALLEGATIONS**

The Amended Complaint alleges that Defendant is a manufacturer of farm equipment. (Am. Compl. at ¶ 7.) Plaintiff is a "farm equipment manufacturer and dealer." (*Id.* at ¶ 8.) Plaintiff alleges that it "markets, advertises and sells [Defendant's] products to dealers and end-users" in Pennsylvania, West Virginia, Virginia, Maryland, Washington, D.C., Delaware and New Jersey ("Mid-Atlantic Territory"). (*Id.* at ¶¶ 9,12.)

Plaintiff's relationship with Defendant began in 1945 and Plaintiff was the first independent distributor and dealer to sell Defendant's products. (*Id.* at ¶¶ 10,11.) Plaintiff alleges that since 1945, it has "purchased millions of dollars" of Defendant's products from Defendant, "extensively marketed and advertised" Defendant's products, "created and nurtured a market and customer base" for Defendant's products and "created, trained and sustained a sales force focused on the promotion and sale" of Defendant's products. (*Id.* at ¶¶ 13-16.) Plaintiff has increased its productivity as a distributor and dealer in recent years and Plaintiff's payments to Defendant for the fiscal year ending in October 2018 reached an "historic high." (*Id.* at ¶¶ 18, 20). Over the years, Defendant has presented Plaintiff with several awards, recognizing Plaintiff as its "#1 distributor." (*Id.* at ¶ 17.)

On January 1, 2008, Plaintiff and Defendant entered into a "Distributor Agreement" ("the "Agreement"). (Am. Compl. at ¶ 21, Exh. A[1].) The Agreement specifically states that its purpose is for stating: (a) "the terms, discounts and conditions of sale and purchase of [Defendant's] products…", (b) "territories covered by distributor", and (c) "other coverages." (*Id.*) Plaintiff alleges that "[w]hile the written agreement between [Defendant] and [Plaintiff] is captioned 'Distributor Agreement,' [Plaintiff] has continued throughout its 73-year relationship with [Defendant] to actually serve as both distributor and dealer of [Defendant's] products, including specifically sales of [Defendant's] products directly to end users." (*Id.* at ¶ 22.)

Plaintiff alleges that under the Agreement, Defendant agrees that Plaintiff is "the 'primary' seller" of Defendant's products "'within [Plaintiff's] territory.'" (*Id.* at ¶ 23.) Plaintiff further alleges that "[a]s the Agreement has been interpreted and carried out by the parties, the Agreement gives [Plaintiff] exclusive rights to sell Defendant's] products within [Plaintiff's] specified territory…" (*Id.* at ¶ 24.) Plaintiff also alleges that although the Agreement gives either party the right to cancel at any time up to 30 days written notice, the Agreement also specifically provides that it is 'governed by Missouri Laws.'" (*Id.* at ¶ 25.)

On December 4, 2018, Defendant delivered a letter to Plaintiff, informing Plaintiff that Defendant was terminating the Agreement. (*Id.* at ¶ 30.) According to Plaintiff, the letter did not provide ninety (90) days of notice as required by Missouri law. (*Id.* at ¶ 31*.)* The letter also did not state any reasons constituting good cause for termination or sixty days in which to cure any deficiency as required by Missouri law. (*Id.*at *¶ 32.)*

---

[1] To decide a motion to dismiss, courts may consider exhibits attached to the complaint *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

**3**

Plaintiff alleges that Defendant has recently appointed another entity, Cummings & Bricker, Inc. ("C & B"), as a Distributor "for the same territory identified in the Agreement as [Plaintiff's] territory." (*Id.* at ¶ 38.) Plaintiff further alleges that since 1945, it has been the "exclusive Distributor [for Defendant] in the Mid-Atlantic Territory." (*Id.* at ¶ 39.) Finally, Plaintiff alleges that the Distributor Agreement, "as evidenced by their course of dealing and course of conduct, is that a Distributor assigned a territory is the exclusive Distributor for that territory." (*Id.* at ¶ 40.)

**DISCUSSION**

In Count One, Plaintiff contends that Defendant's actions in terminating the Agreement violate the Missouri Farm Implement Dealership Agreements Act, Mo. Rev. Stat. 407.838, et seq. (the "Farm Dealer Act.")

At the outset, the Court notes that, according to Plaintiff's own allegations, Defendant has not actually terminated the Agreement. The Amended Complaint alleges that on January 4, 2019, Defendant issued to Plaintiff a 90-day "reinstatement" under the Distributor Agreement, which reinstated Plaintiff until April 3, 2019. On April 3, 2019, Defendant issued another extension of Plaintiff's appointment for an additional 180 days. (Id. at ¶ 36). In the April 3, 2019 extension, Plaintiff claimed that Plaintiff's appointment is "non-exclusive." (Id. at ¶ 37.) Perhaps this is why Plaintiff later refers in the Amended Complaint to Defendant's actions as an "attempted termination." (Id. at ¶ 52.)

However, unlike other states, Missouri does not recognize an action for attempted termination under its Farm Dealer Act. *Compare* Idaho Code Ann. § 28-24-103(4) ("It shall be a violation . . . to . . . attempt to terminate or cancel, or threaten not

4

to renew the dealer agreement."), *and* Wash. Rev. Code Ann. § 19.98.120(4) ("It shall be a violation . . . to . . . attempt to terminate or cancel, or threaten to not renew the dealer agreement."), *with* Mo. Rev. Stat. § 407.840 ("No farm equipment manufacturer . . . may terminate, cancel or fail to renew a dealership agreement . . . without good cause."). Therefore, because Plaintiff alleges that Defendant has not actually terminated the Agreement, Defendant could not have violated the Farm Dealer Act.

However, even if Defendant had terminated the Agreement or plans to do so in the future, the Farm Dealer Act is not applicable to the Agreement

Under the Farm Dealer Act,

> **No farm equipment manufacturer ... may terminate, cancel or fail to renew a dealership agreement or substantially change the competitive circumstances of a farm equipment dealership without good cause. Good cause means failure by a farm equipment dealer to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement if such requirements are not different from those requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement**.

Mo. Rev. Stat. § 407.840. (emphasis added.)

A "farm equipment dealer" is defined as "any person, partnership, corporation, association or other form of business enterprise engaged in the retail sale of farm equipment." Mo. Rev. Stat. § 407.838(3). A "dealership agreement" is defined as a written or oral agreement "between a farm equipment manufacturer and a farm

equipment dealer which provides for the rights and obligations of the parties with respect to the purchase or sale of farm equipment." Mo. Rev. Stat. § 407.838(4).

Under the Farm Dealer Act, a manufacturer is obligated to provide at least ninety (90) days of prior written notice before terminating such an agreement. Mo. Rev. Stat. § 407.842. A manufacturer is also required to include in any purported notice of termination of the dealership agreement "all reasons constituting good cause for notice of termination...,and shall provide that the dealer has sixty days in which to cure any claimed deficiency." Mo. Rev. Stat.§ 407.842.

Plaintiff contends that the Agreement satisfies the definition of "dealership agreement" under the Farm Dealers Act simply because it provides for the rights and obligations of the parties with respect to the purchase and sale of farm equipment. Although the Agreement does provide for the rights and obligations of the parties with respect to the purchase and sale of farm equipment, it clearly does not do so in the context of an agreement between a manufacturer and a farm dealer.

Under Missouri law, "[t]he cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W. 3d 421, 428 (Mo. Banc 2003). (citation omitted.) "The terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning." *Id.* (citation omitted.) "Additionally, each term of a contract is construed to avoid rendering other terms meaningless." *Id.* (citation omitted.) "A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Id.* (citation omitted.)

**6**

The Agreement is specifically styled as a "Distributor Agreement" and not as a "Dealership Agreement." Indeed, Plaintiff is referred to as "distributor" throughout the Agreement. For example, the introduction provides that "[t]his agreement is between Danuser Machine Company, Inc., hereinafter called "manufacturer", and the undersigned, hereinafter called "**distributor**", for the purpose of stating "A" terms, discounts, and conditions of sale and purchase of Danuser products listed on current year Danuser yellow price sheets, "B" territories covered by **distributor**, and "C" other coverages. (Am. Compl., Exh. A.) (emphasis added.) Paragraph A-1 states that "[m]anufacturer extends to **distributor** the following discounts…." (*Id.*) (emphasis added.) Paragraph B-1 states that "[m]anufacturer agrees **distributor** is to have primary area of responsibility on the sale of products within the following territory…" (*Id.*) (emphasis added.) The two exemptions to his paragraph both mention "**distributor's** territory" (*Id.*) (emphasis added.) Paragraph C-1 states "[**d**]**istributor** agrees to maintain necessary warehousing, a reasonable stock of products, and a suitable sales and service staff to adequately support all **dealers** in the territory. **Distributor** agrees to promote sales of Danuser products and display Whole Goods at State Fairs, Field Days, Regional Shows, etc." (*Id.*) (emphasis added.) Paragraph C-2 states, [a] handling charge of 15% will be deducted from credit issued to **distributor** on merchandise in resalable condition . . ." (*Id.*) (emphasis added.) Paragraph C-3 states, "[m]anufacturer shall not be responsible for or bound by any acts of the employees, canvassers, or other persons in any capacity in the service of the **distributor**, and such persons shall in no sense be deemed employees of agents of the manufacturer. For any default, negligence, or misconduct by such persons, the **distributor** shall be responsible." (*Id.*)

(emphasis added.) Paragraph C-4 states that "[u]pon termination of this agreement by either party, manufacturer reserves the right to purchase from **distributor** all new and current stock . . ." (*Id.*) (emphasis added.) Finally, the Agreement provides that it is "governed by Missouri Laws and supersedes any and all previous contracts, if any, between manufacturer and **distributor**, whether written or verbal, and is the only agreement now in effect between manufacturer and **distributor**." (*Id.*) (emphasis added.)

Noticeably absent from the Agreement are any provisions indicating an agreement between the parties for Plaintiff to sell any of Defendant's products at retail. Indeed, the Agreement makes absolutely no reference to Plaintiff in its capacity as a "dealer" engaged in the retail sale of farm equipment. The only place the word "dealer" appears in the Agreement is in paragraph C-1 which obligates the "**distributor** [Plaintiff] to provide necessary warehousing, stock of products and as suitable sales and service staff to adequately support all **dealers** in the territory." If Plaintiff was actually **a dealer** under the Agreement, it would be impossible for it to adequately provide support to **all other dealers** in the Mid-Atlantic Territory. Thus, the parties did not equate the role of distributor with the role of dealer. In addition, if the parties contemplated that the distributor should also support all **end-users** in addition to dealers, they could have easily added that language.

Plaintiff argues that at the very least the Agreement is ambiguous as to whether it contemplated retail sales by Plaintiff.

"A contract is ambiguous only if its terms are susceptible to fair and honest differences." *Id.* (citation omitted.) "A contract is not ambiguous merely because the

parties disagree as to its construction." *Id.* "Where the language of a contract is unambiguous, the intent of the parties is to be gathered from the contract alone, and a court will not resort to construction where the intent of the parties is expressed in clear, unambiguous language." *Id.* at 429. (citation omitted.) "Extrinsic evidence may not be introduced to vary or contradict the terms of an unambiguous agreement or to create an ambiguity." *Id.* (citation omitted.)

Here, the Court finds that the terms of the Agreement, when read as a whole, are quite clear and unambiguous and reveal that it was the intent of the parties to have entered into a pure distributor agreement that did not include retail sales. Moreover, Plaintiff cannot rely on the fact that the Agreement is silent as to retail sales to claim ambiguity. "It has long been held that an 'ambiguity cannot be created by silence, especially when both parties are sophisticated bargainers.'" *Morelock-Ross Properties, Inc. v. English Vill. Not-for-Profit Sewer Corp.,* 308 S.W.3d 275, 280 (Mo. Ct. App. 2010) (quoting *Halls Ferry Investments, Inc. v. Smith,* 985 S.W.2d 848, 853 (Mo. Ct. App. 1998)).

Although Plaintiff repeatedly requests that the Court consider the parties' course of dealing over the past 73 years as evidence that Plaintiff engaged in retail sales for Plaintiff, there is no need to do so where the Agreement is unambiguous on its face. While Plaintiff may have engaged in retail sales for Defendant in the past, it was clearly not the intent of the parties to include retail sales in the Agreement.

Therefore, the Court finds that there was never any "dealership agreement" between the parties as that term is defined by the Farm Dealer Act and that the Farm Dealer Act is simply not applicable. Count One is, therefore, dismissed.

In Count Two, Plaintiff alleges that Defendant has breached the express terms and implied terms of good faith and fair dealing of the Agreement by failing to provide appropriate notice of or to state good cause for termination, as required by the Farm Dealer Act.

Under Missouri law, a breach of the covenant of good faith and fair dealing occurs "when a party, in bad faith, utilize[s] contract language that allow[s] unilateral action to improperly deny the other party from expected benefits flowing from the contract." *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 412 (Mo. Ct. App. 2000) (citation omitted.)

Besides the fact that the Amended Complaint itself alleges that Defendant did not actually terminate the Agreement (and thereby could not have breached any covenant of good faith and fair dealing), the Court has just found that the Agreement is not governed by the Missouri Farm Dealer Act. Therefore, Defendant did not have to show good cause or provide 90-days of notice before terminating the Agreement. Instead, pursuant to the Agreement, either party could cancel the Agreement, with or without cause, upon giving 30 days written notice to the other party. Because the cancellation provision allows either party to terminate the Agreement, the provision is bilateral in nature, not unilateral, and thus, under *Koger*, Defendant's actions cannot be characterized as a misuse of this bilateral contract term. Accordingly, Count Two will be dismissed.

In Count Three, Plaintiff alleges that "[u]nder the Agreement, and as evidenced by their course of dealing and course of conduct over a period of more than 73 years, [Defendant's] appointment of a Distributor in a territory is the appointment of an

exclusive Distributor for that territory." (Am. Compl. at ¶ 63.) As a result, Plaintiff alleges that "Defendant's appointment of a second Distributor in the Mid-Atlantic Territory is a breach of the Agreement." (*Id.* at ¶ 65.)

Plaintiff relies on paragraph B-1 of the Agreement, which states that "[m]anufacturer agrees distributor is to have primary area of responsibility on the sale of products within the following territory . . ." (Am. Compl., Exh. A.) Plaintiff reads the words "primary area of responsibility" as granting it the right to be the exclusive distributor in the Mid-Atlantic Territory and contends that by appointing a second distributor to the Territory, Defendant has violated the Agreement. The Court does not agree.

Giving paragraph B-1 its plain meaning, the Court finds that "primary area of responsibility" simply does not equate to "exclusive territory." Instead, the Court reads this language as merely stating that Plaintiff's primary area for distributing Defendant's products is the Mid-Atlantic Territory. While paragraph B-1 does not prevent Plaintiff from distributing Defendant's products in other territories (or from distributing competitor's products in the Mid-Atlantic Territory), it is clear that Plaintiff is to focus its sales efforts of Defendant's products in the Mid-Atlantic Territory. Nor is there any language in paragraph B-1 that would prevent other of Defendant's distributors from selling in that Territory. The language in question simply does not grant the Plaintiff the right to be the exclusive distributor in the Mid-Atlantic Territory. The word "exclusive" is not written anywhere in the Agreement. Moreover "primary" does not even modify "distributor," but instead modifies the term "area of responsibility." There is no mention in the Agreement of a "primary seller" or "primary distributor."

Although Plaintiff argues that paragraph B-1 is ambiguous and therefore the Court must resort to extrinsic evidence of prior course of performance between the parties[2], "[e]xtrinsic evidence may not be introduced to vary or contradict the terms of an unambiguous agreement or to create an ambiguity." *Dunn Indus.*, 112 S.W. 3d at 428. Likewise, "[a] course of performance by the parties to a contract which tends to show an interpretation by either one or both parties contrary to the plain terms of the contract does not control, but rather the contract is construed as written." *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 409 (Mo. Ct. App. 1996). Therefore, Plaintiff's claim for breach of contract based on violation of provision B-1 of the Agreement is dismissed.

Finally, in Count Four, Plaintiff claims that even if the Court finds that the Distributor Agreement is not exclusive, Defendant has breached the Agreement by failing to provide Plaintiff with information about C & B so as to allow Plaintiff to maintain its "contractually protected position" as the primary Distributor of Defendant's products in the Mid-Atlantic Territory. (*Id.* at ¶ 71.) Since the Court has already concluded that paragraph B-1 of the Agreement does not grant Plaintiff the right to be the primary or exclusive Distributor of Defendant's products in the Mid-Atlantic Territory, but rather states that Defendant's primary area of responsibility is the Mid-Atlantic Territory, Count Four lacks merit. In addition, there is no provision in the Agreement that requires Defendant to divulge to Plaintiff the documentation it requests. Therefore, Count Four is dismissed.

---

[2] Plaintiff bases this argument on Missouri's adoption of Article 2 (Statute of Frauds) of the Uniform Commercial Code. However, under Missouri law, distributorship agreements are not covered by Article 2 of the UCC. *Major Brands, Inc. v. Mast-Jagermeister US, Inc.*, No. 4:18CV423 HEA, 2019 WL 1130294, at *6 **(E.D.** Mo. Mar**.** 12, 2019) (citing *Adventure Mktg. Grp., Inc. v. Premier Specialty Brands, LLC*, No. 13-3022-CV-S-DW, 2013 WL 12355438, at *3 (W.D. Mo. June 6, 2013)).

An appropriate Order follows.